# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOSEPH JAMES SIMONETTI,    )
                                              )     **Case No. 13 CV 04394**
               **Plaintiff,**   )
                                              )     **Honorable Michael T. Mason**
       **v.**                         )
                                                )
**CAROLYN W. COLVIN, Acting**   )
**Commissioner of Social Security,**   )
                                              )
             **Defendant.**  )

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

This case is before the Court on the parties' cross motions for summary judgment. For the reasons explained below, the plaintiff's motion for summary judgment [17] is denied and the Commissioner's motion for summary judgment [22] is granted. The decision of the Commission to deny benefits is affirmed.

## I.    BACKGROUND

### A.    Procedural History

Joseph Simonetti filed an application for Disability Insurance Benefits ("DIB") on November 18, 2009. (R. 78-79). Simonetti also filed an application for Supplemental Security Income Benefits ("SSI") on January 29, 2010. (R. 80-81). Simonetti alleged disability beginning February 6, 2007. (R. 265). His claims were denied on May 12, 2010 and upon reconsideration on September 30, 2010. (R. 87-90, 105-106). Simonetti requested a hearing before an Administrative Law Judge ("ALJ") and the case was assigned to ALJ Roxanne Kelsey, who held the requested hearing on January 31, 2012. (R. 105-106, 116-120). ALJ Kelsey issued a written decision denying Simonetti's

request for benefits on March 19, 2012. (R. 10-20). Simonetti requested review before the Appeals Council, submitting some additional medical records to support his claim for benefits. The Appeals Council declined to consider the new records and subsequently denied Simonetti's request for review on April 25, 2013. (R. 1-4). Thus, the ALJ's decision became the final decision of the Commissioner. (R. 1); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998). Simonetti subsequently filed this action in the district court, seeking review of that decision.

## B. Simonetti's Testimony

At the hearing before the ALJ on January 31, 2012, Simonetti testified that he was born on September 21, 1967, graduated from high school and is able to communicate in English. (R. 171, 174, 176). He testified that he resides with his two children, who are in school, and with his girlfriend, who works full time. (R. 49).

Simonetti alleged disability as of February of 2007 and testified that he has not worked since that time. (R. 47). Prior to the date of his alleged onset, Simonetti worked as a truck driver. (R. 177). He testified that his main health problems include headaches and chronic neck pain. (R. 47). Simonetti also testified that his hands swell up when he uses them and that he recently began receiving shots of pain killers in his toes because he has problems walking. (R. 47-48).

Simonetti testified that he has a driver's license but rarely drives any more. (R. 49). He testified that he will take trips to the gas station two to three blocks from his house to buy pop. (*Id.*). After driving for a while he gets bad neck pains that lead to lower back aches and headaches. (*Id.*). He testified that he normally drives at night and the lights hurt his eyes and worsen his headaches. (R. 50).

Simonetti testified that he is occasionally responsible for getting his son from school. (*Id.*). The school is a mile away and Simonetti walks or has someone else drive him to pick up his son. (*Id.*). A few times the school had to call because Simonetti forgot. (*Id.*). He testified that when he walks his feet swell up and pains develop in his shins so he prefers to find a ride. (R. 51). Other than the few times he picked his son up from school, he has not attended one of his children's school or sport activities in over a year except for a parent-teacher conference. (*Id.*).

While Simonetti's children and girlfriend are gone for the day he testified that he sits at home and watches TV. (R. 55). He does not have any favorite TV shows and does not read because it causes headaches. (*Id.*). Simonetti testified that he changes the channel continuously and does not remember what he was watching. (R. 59). He testified he has not had a hobby in five years and no longer participates in social organizations. (R. 64-65). During the holidays he will get together with family and friends if they come over to his house, but he rarely travels to other homes. (R. 55-56). Simonetti occasionally does household chores such as throwing in laundry once or twice a month and starting dinner every once in a while. (R. 55). However, he testified that his family does not want him cooking anymore because he left the stove on a couple times and almost burned the house down. (*Id.*).

Simonetti testified that he has not been pain-free for even a single day since his car accident in 2007. (R. 57). He had neck surgery to decrease the pain, but according to Simonetti the pain is now worse. (R. 57-58). He also testified that he had surgery on his right shoulder and now claims it does not move like it used to. (R. 63). He testified that the doctors wanted to go back in and fix the part that did not heal correctly, but

3

Simonetti said no because of the problems with his neck surgery. (*Id.*). In the past, he had physical therapy, but not since his last car accident in 2009. (R. 57).

Simonetti testified he was taking various prescription medications for headaches, depression, anxiety and pain. (R. 51-52). He did not know how to pronounce the different medications and could not remember all of the names, but assumed there were at least 10. (*Id.*). He testified the medications may be part of the reason for his memory and sleep problems. (R. 52). Simonetti also testified that the medications for headaches only work on some days; he testified that, on other days, he "could take pain pill after pain pill" and still end up in the emergency room. (*Id.*).

Simonetti clarified that the headaches are actually migraines and that he takes two different medications, one that he takes every day and one that he takes only when he has a migraine. (R. 53). He testified that he gets migraines three to five times a week and five to eight a month are so bad that they cannot be controlled. (R. 54). He testified that the doctors want to put him on a higher dosage, but he said no because he is worried about the side-effects of a stronger medication since he is already forgetful. (R. 64).

Simonetti testified that when he gets headaches he has to go into a quiet room without disruptions from his family members. (R. 61). He testified that the headaches last for days and that he is incapacitated at least fifteen to twenty days a month. (*Id.*). Simonetti testified he gets irritable and will occasionally yell at strangers in public. (*Id.*). He testified he once yelled at a woman for snapping her gum because his ears become sensitive when he has headaches. (*Id.*).

Simonetti testified that turning his head to the right or the left causes him pain in his neck. (R. 62). He also said that looking up causes pain and looking down relieves many of the issues. (*Id.*). Simonetti then testified that he uses an ice pack machine, hot shower, or heat pack to relieve his neck pain. (R. 55). He testified that activities such as throwing a ball around with his son for half an hour can cause him to "be stuck on the couch or bed for a few days." (R. 56). Simonetti also testified that doing the dishes will cause excruciating pain in his lower back. (*Id.*).

Simonetti testified that his right hand is his good hand and it swells up if he uses a pencil or screwdriver. (R. 58). He testified that writing a short note causes his hand to swell up between his index finger and thumb and leaves him unable to move his fingers because the pain is so bad. (R. 58-59). Simonetti testified that he can sign his own name without any problems and can type for a maximum of five minutes. (R. 59, 62). He can also use zippers and open doors. (R. 59).

Simonetti testified he can lift ten to fifteen pounds. (R. 58). He testified he can sit for an hour and stand for five to thirty minutes, depending on his feet that day. (*Id.*). Simonetti testified that he can walk "a couple houses" for the most part and can sometimes walk a few blocks. (*Id.*). He testified that he could work for ten to fifteen minutes over his head until he suffers from a pinching pain in his shoulder. (R. 63). He testified that this pain occurs when he works with either his right arm or left arm. (*Id.*).

Simonetti testified during the hearing that he was starting to get a headache from his lower back and neck pain, even though he took his medication that morning. (R. 56).

Simonetti testified that he sometimes forgets to attend doctor appointments and sometimes forgets to take his medication; other times, he forgets that he has already taken his medication and his family has to stop him from taking it twice. (R. 59, 60). He testified that he also sometimes forgets to give his son his ADHD medication in the morning, which causes disruptions at school. (R. 60). Simonetti testified that he has difficulty staying on task. (R. 63). He explained that his Social Security papers had to be resent and calls had to be made to remind him of the importance and need for the complete product. (R. 63-64).

### C.   Vocational Expert's Testimony

After hearing from Simonetti, the ALJ heard from Lee Knutson, who testified as a vocational expert ("VE"). (R. 114-115, 137). The VE described Simonetti's past work as a truck driver of a tractor trailer combination as medium, semi-skilled, and at times performed at heavy. (R. 66).

The ALJ asked the VE to consider a hypothetical person with the same age, education, and past relevant work as Simonetti. (R. 67). The ALJ then asked the VE to assume the individual could perform light work; may occasionally climb ladders, ropes, or scaffolds; and may occasionally kneel, crouch, or crawl; and the individual may frequently, but not continuously, reach overhead with either upper extremity. (*Id.*). In addition the individual would remain able to perform unskilled work despite his memory loss, which would only prohibit complex or detailed work. (*Id.*). The VE testified that such an individual could not perform Simonetti's past job. (*Id.*).

The VE also testified that, in Illinois, there are other positions that the hypothetical individual could perform, including: 23,000 assemblers positions, 20,000 labeling machine operator positions and 57,000 cashier positions. (R. 67-68).

The VE testified that, even if the hypothetical individual could occasionally use his left non-dominant upper extremity for gross manipulation, the past work would still be precluded. (R. 68, 70). However, the VE testified that such an individual could perform work as a sales attendant (35,500 positions), information clerk (4,700 positions) and an unskilled counter and rental clerk (6,200 positions). (R. 68). The VE testified that he was assuming that the individual could use his dominant hand frequently. (*Id.*). He testified that a majority of the jobs would be eliminated if the individual could not reach bilaterally overhead and could not occasionally use both hands overhead. (R. 71). The VE stated that the hypothetical individual could work as a parking lot attendant at a self-serve lot (250-500 positions). (R. 71-72).

The ALJ then asked the VE to consider a hypothetical individual who can sit, stand, or walk for a total of two hours each in an eight-hour workday, and would need to be permitted to take breaks throughout the day on an as-needed basis, the individual can lift ten pounds occasionally or frequently, and would miss four or more days a month because of his pain. (R. 69). The VE testified that such an individual would be unemployable because such absences would be excessive; the VE testified individuals may not take as-needed breaks throughout the workday. (*Id.*).

The VE further testified that missing approximately four days of work a month would eliminate employability. (R. 71). The VE stated that if an individual is

consistently absent ten percent of the time or more, or two days or more a month on a regular basis, he would not be able to perform or keep any of the jobs listed. (*Id.*).

### D. Medical Evidence

The ALJ's decision was based on her review of the medical evidence, as well as the testimony received at the January 31, 2012 hearing. Those records show that Simonetti was thirty-nine years old at his alleged onset date (February 6, 2007), making him a "younger individual," for purposes of the Act. (R. 10, 19, 171; 20 CFR 404.1563 and 416.963). The medical records Simonetti put before the ALJ date from 2009, two years after his alleged onset date. (R. 218). However, he has indicated that he was in three car accidents during the period from 2007 to 2009 -- one in February 2007, one in January 2008 and one in January 2009. (R. 212, 334). As a result of the accidents, Simonetti apparently underwent cervical spine fusion surgery, left knee surgery, and right shoulder surgery. There are no medical records documenting the accidents or the resulting surgeries, but the records do note his surgical scars. (R. 227, 268).

### 1. Treating Physicians

The record shows that, in June 2009, Simonetti was admitted to Palos Community Hospital with a right groin abscess and cellulitis for which he underwent "incision, drainage and debridement". (R. 221-223). While in the hospital, Simonetti developed chest pain, but had normal cardiac enzymes, ECG and EKG, without any signs of ischemia or prior infarction. (R. 236). A few days later, his ecohocardiogram was abnormal, and showed mild tricuspid regurgitation, mild mitral regurgitation and mild pulmonic valvular regurgitation. (R. 257-260). Simonetti steadily improved and was then discharged in good condition. (R. 225).

In January 2011, an MRI of the left shoulder showed focal distal supraspinatus tendionpathy without evidence of rotator cuff tear. (R. 342). In June 2011, Simonetti visited Roger Lichtenbaum, M.D., a neurosurgeon on a referral. (R. 334-335). At that time, Simonetti reported symptoms, including daily headaches with blurry vision, left sided joint pain, upper extremity pain and numbness in the forearm with lifting, left lower extremity pain, low back pain, feeling of being "hung over," memory impairment, weakness on the left causing him to drop objects and chest pain in the clavicle region daily. (R. 335). Review of the MRI of the cervical spine showed the prior fusion with only mild degenerative disease at other areas without any significant canal or neuroforaminal compression. (R. 334-335). Dr. Lichtenbaum stated that he did not see any significant pathology to be causing limited left upper and lower extremity symptoms. (R. 335). He noted it would be very unusual for any cervical spine pathology to be causing limited left upper and lower extremity symptoms. (R. 335).

In April 2011, Simonetti underwent nerve conduction studies, which were normal for all four limbs, and cervical and lumbar paraspinal musculature. (R. 339). No evidence was found for a cervical or lumbar radiculopathy, myopathy, generalized polyneuropathy, entrapment neuropathy or left brachial plexopathy. (Id.)

In July 2011, Simonetti visited the emergency room at Palos for right foot pain after having an alcoholic beverage the previous evening; the diagnosis was "gouty attack" on his right foot. (R. 286).

In December 2011, Simonetti visited the emergency room at Palos for dizziness, numbness, tingling and paresthesias. (R. 301). It was noted he had "multiple, vague complaints that he has had on and off over the past number of months" in particular

9

episodes of a racing heart. (*Id.*). Simonetti reported he took himself off of ten to twelve different types of medications for anxiety and depression. *Id.* He also reported that he had no chest pain or nausea. (*Id.*). He was discharged in good condition. (*Id.*).

In January 2012, Simonetti was diagnosed with chronic daily headaches. (R. 333). He reported that his headaches were relieved by Sumatriptan and Naprosyn in June 2011 and by Sumatriptan in January 2012. (*Id.*).

The records also show that, with a Body Mass Index of 32.9, Simonetti is obese. (Ex. 262, 268). He also suffers from depression and was prescribed Lexapro by his doctor. (R. 278). In December 2011 and January 2012, he received three sessions of therapy at Genesis Therapy Center and it was noted that he appeared frustrated, angry and sad. (R. 327). His mentation and memory were normal at the consultative exam. *Id.*

### 2. Agency Consultants

In May 2010, state agency consultant Dr. Raymond Castaldo noted that Simonetti had failure to cooperate with attempts to obtain information, that he could get no response from attending sources, and that Simonetti, who was contacted for assistance, also failed to respond. (R. 329-331).

In September 2010, Simonetti underwent a consultative examination with M.S. Patil, M.D. (R. 265-268). Simonetti complained of constant mild to moderate pain in his lower back area radiating to his left lower extremity and mild to moderate non-radiating pain in his neck. (R. 265). He alleged that the neck pain caused him to have constant headaches and reported a heart attack eighteen months earlier. (*Id.*). However, the test results were essentially normal, with his cervical spine range of motion within

normal limits. (R. 267). He had slightly reduced range of motion in the lumbar spine with flexion of 60/90 degrees. (*Id.*). His shoulder flexion was 140/150 bilaterally, abduction was 140/150 bilaterally, internal rotation was 70/80 bilaterally, and external rotation was 80/90 bilaterally. (*Id.*). His knee flexion was 140/150 bilaterally. (*Id.*). Simonetti's neurological exam was normal, he had 5/5 motor strength in all upper and lower extremities, he had normal fine and gross manipulation, he had good grip, and circulation and sensation were within normal limits. (*Id.*). His tandem walking was "O.K.", he could walk on heels and toes with some difficulty, he had normal gait and could get on and off exam table. (R. 268). His speech, mentation and memory were normal. *Id*. Simonetti had no joint deformity. (*Id.*). He could squat/rise with some difficulty. (R. 268). In addition, Simonetti's cardiopulmonary, abdominal and neurological examinations were essentially normal. (R. 267).

Also in September 2010, state agency consultant, Dr. Richard Bilinsky, opined that Simonetti could perform light work. (R. 270). He determined that Simonetti could occasionally climb ladders, ropes and scaffolds, occasionally kneel, crouch and crawl. (R. 271). Dr. Bilinsky also noted that Simonetti is limited to frequent overhead reaching with bilateral upper extremities. (R. 272).

### 3.    New Medical Evidence

On March 26, 2012, two weeks after the ALJ issued her decision, Simonetti was admitted to the emergency room at Advocate Christ Medical Center for four days. (*See* Plaintiff's Memorandum in Support of Summary Judgment, Exhibit A). Records documenting this event obviously were not before the ALJ. But Simonetti submitted these records to the Appeals Council as new evidence after the ALJ made her decision.

The Appeals Council declined to consider the treatment records, finding that the records contained new information about a later time and therefore did not affect whether Simonetti was disabled on or before March 19, 2012. (R. at 2).

In the emergency room, Simonetti complained of chest pain and reported that he could not recall how he ended up at the ER. It was noted that he seemed agitated after his denial of social security. He had a CT scan and a chest x-ray that did not reveal any abnormalities. In addition the MRI of his brain and C-spine were also negative for abnormalities. A cardiologist, neurologist and a psychologist tended to him. Simonetti's stress test was negative for any ischemia. It was also noted that he "is spastic at baseline", and that he "is hyperreflexic with crossed adductors."

### E. ALJ's Opinion

The ALJ issued her decision on March 19, 2012, finding Simonetti to be not disabled at step five. (R. 20). The decision is discussed in greater detail below, but, briefly, the ALJ found that Simonetti could not perform his past relevant work as a truck driver, but that he could perform other jobs that existed in significant numbers in the national economy. (R. 19-20). Simonetti raises a number of challenges to the decision, and argues that the ALJ committed several errors in finding him not disabled; he seeks summary judgment reversing or remanding the matter to the Commissioner. The Commissioner seeks summary judgment affirming her decision to deny benefits.

## II. DISCUSSION

### A. Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart,* 290 F.3d

936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof." *Kepple v. Massanari,* 268 F.3d 513, 516 (7th Cir. 2001). It means "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue,* 496 F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir. 1995). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple,* 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel,* 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez,* 336 F.3d at 539. While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz,* 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that [she] considered the important evidence and ... to enable us to trace the path of [his] reasoning." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002)(*quoting Hickman v. Apfel,* 187 F.3d 683, 689 (7th Cir. 1999)).

## B. Analysis under the Social Security Act

In order to qualify for disability insurance benefits under the Act, Simonetti must establish that he is under a disability. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

In determining whether Simonetti is disabled, the ALJ must considered the following five-step inquiry: "(1) whether Simonetti is currently employed, (2) whether Simonetti has a severe impairment, (3) whether Simonetti's impairment is one that the Commissioner considers conclusively disabling ('a listing-level impairment'), (4) if Simonetti does not have a conclusively disabling impairment, whether he can perform his past relevant work, and (5) whether Simonetti is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. Simonetti has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If Simonetti reaches step five, the burden then shifts to the Commissioner to show that "Simonetti is capable of performing work in the national economy." *Id.* at 886.

ALJ Kelsey applied this five-step analysis. At step one, she determined that Simonetti has not engaged in substantial gainful activity since the alleged onset date of February 6, 2007. (R. 12). At step two, the ALJ concluded that Simonetti suffers from the following severe impairments: "status post cervical spine surgery; status post left knee surgery; status post right shoulder surgery; obesity; history of myocardial infarction; headaches; heart impairment and depression ." (*Id.*). At step three, the ALJ

14

concluded that Simonetti does not have an impairment or a combination of impairments, either mental or physical, that meets or medically equals the severity of one of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13).

Next, the ALJ determined that Simonetti has the RFC to perform light work as defined in 20 C.F.R § 404.1576(b) & § 416.967(b). (R. 15). The ALJ further concluded that Simonetti can occasionally climb ladders, ropes and scaffolds; occasionally kneel, crouch or crawl; may frequently, but not continuously, reach overhead with either arm; and can perform unskilled work. (*Id.*).

At step four, the ALJ concluded that Simonetti could not perform his past work as a truck driver. (R. 18-19). The ALJ then concluded that because Simonetti was 39 years old at the time of the alleged disability onset date, February 6, 2007, he was classified as a younger individual (ages 45-49) pursuant to 20 C.F.R § 404.1563. (R. 19). At step five, the ALJ found that, given Simonetti's age, education and restrictions, he could perform a significant number of jobs in the economy (*Id.*). Based on this finding, the ALJ concluded that Simonetti was not disabled under the Act and denied his application for DIB and SSI. (R. 20).

### C.   Analysis of Simonetti's Arguments

Simonetti now raises a number of issues, arguing (1) that the Appeals Council improperly failed to consider the March 2012 inpatient hospitalization records as new material evidence, (2) that the ALJ erred in making an adverse credibility finding, and (3) that the ALJ erred in the weight she gave to the opinions of the State Agency physicians, while failing to obtain testimony from a medical expert. We address each of these arguments below.

### 1.    The Appeals Council's Refusal to Review New Evidence

Simonetti argues that the case should be remanded for consideration of evidence that he submitted to the Appeals Council after the ALJ issued her decision. To necessitate remand, new medical evidence must be new and material, and there must be good cause "for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g) (2012). New evidence is material if it was "not in existence or available to the claimant at the time of the administrative proceeding." *See Sample v. Shalala*, 999 F.2d 1138, 1144 (7th Cir. 1993) (quoting *Sullivan v. Finkelstein*; 496 U.S. 617, 626 (1990)). In addition, there must be "a reasonable probability that the Commissioner would have reached a different conclusion had the [new] evidence been considered." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997).

Simonetti argues that the inpatient medical records from two weeks after the hearing are new and material evidence that "might be just the type of medical evidence" to change the decision of the ALJ. He argues that the Appeals Council used boilerplate language and did not explain its decision process in declining review. However, the Seventh Circuit has held that medical records "postdating the hearing" and that "speak only to [the applicant's] current condition, not to [his] condition at the time his application was under consideration by the Social Security Administration" do not meet the standard for new and material evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005)(citing *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990)). Nor has Simonetti shown that there is a "reasonable probability" that a different decision would have been reached if the new evidence had been submitted and considered by the ALJ

16

prior to her issuing her decision. Indeed, the new records revealed no abnormalities, and Simonetti has not explained how or why they might have changed the ALJ's mind. Accordingly, we find that the Appeals Council appropriately declined to consider the additional treatment records.

### 2. The ALJ's Credibility Findings

Simonetti argues that the ALJ erred in making an adverse credibility finding by giving little consideration to Simonetti's history of cervical, knee, and shoulder surgeries and symptoms associated with those areas. He contends that the ALJ's credibility determination was conclusory boilerplate, and that the ALJ inappropriately discounted Simonetti's reports of pain.

In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009)(citing 20 C.F.R. § 404.1529(c); SSR 96–7p). An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano,* 556 F.3d at 562 (citing SSR 96–7p; 20 C.F.R. §404.1529(c)(2)); *Johnson v. Barnhart,* 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported directly by the medical evidence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96–7p requires the ALJ to consider "the

entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007)(citing 20 C.F.R. § 404.1529(c); SSR 96–7p).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele,* 290 F.3d at 942 (citing SSR 96–7p). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele,* 290 F.3d at 942.

Simonetti contends that the ALJ used "meaningless boilerplate" language to discredit his statements and improperly discounted them as inconsistent with her RFC finding, rather than considering whether they were consistent with the overall record. In her decision, the ALJ stated in part:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are consistent with the above residual functional capacity assessment.

(R. at 16). This is the same language that the Seventh Circuit has repeatedly described as "meaningless boilerplate" because it "yields no clue to what weight the [ALJ] gave

18

the testimony" and fails to link the conclusory statements made with the objective evidence in the record. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). "However, the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if [she] otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). The ALJ did that here.

Rather than simply stopping with the boilerplate language, the ALJ here gave several reasons for discounting Simonetti's credibility, based upon a number of factors and observations. First, the ALJ noted that Simonetti received very little medical treatment until 2009 – two years after his alleged onset date. (R. at 18). Additionally, the record indicated that, in May of 2010, Simonetti failed to cooperate with state agency Dr. Raymond Castaldo, who noted his failure to respond and his refusal to assist the agency in obtaining information to support his application. (*Id.*). Even now, Simonetti has not explained the lack of medical records dying the first two years of his alleged disability; nor has he explained his failure to provide agency support in assessing his claims.

The ALJ also noted a number of discrepancies between Simonetti's testimony and the medical records. (*Id.*). For example, the treatment notes show that Simonetti's headaches were relieved with medication, though he testified that he got no relief. (*Id.*). Additionally, the record was silent as to both the frequency and the severity of his symptoms. (*Id.*). At the hearing Simonetti also testified that he had severe memory loss, but again there was nothing in any of the records to document this. (*Id.*). In fact, his mentation and memory were normal at the consultative exam. (*Id.*). Nor had

19

Simonetti ever reported to any doctor or medical professional that he was unable to get along well with others, though he testified that this was a problem for him. (*Id.*).

What's more, the records failed to support Simonetti's claims concerning his headaches, with many of the diagnostic tests showing findings within normal limits. (*Id.*). Simonetti's neurological exams were normal, and the tests do not show neurological deficit. (*Id.*). The ALJ accommodated Simonetti's cervical and shoulder impairment by limiting his overhead reaching even though one of the treating physicians stated that "it would be very unusual for any cervical spine pathology to be causing limited left upper and lower extremity symptoms." (R. at 17).

The ALJ determined that the lack of treatment records and these general inconsistencies combined showed that Simonetti's allegations were not entirely credible because they were inconsistent with his medical test results and treatments. (*Id.*). The ALJ explained that she "considered [his] impairments individually and in combination, and [she] accommodated the claimant's headaches, depression and memory loss by limiting the claimant to unskilled work." (R. at 18). The ALJ found that giving Simonetti "the benefit of the doubt," he would have the ability to perform unskilled work and the memory loss would only prohibit complex or detailed work. (*Id.*). In short, the ALJ's credibility analysis is sufficiently explained and supported, and we see no reason to second guess the ALJ's credibility findings.

### 3. The Lack of a Medical Expert

Finally, Simonetti argues that the ALJ gave great weight to the opinion of non-examining State Agency physician Richard Bilinksy. He notes that this examination took place more than a year before the hearing. He contends that the ALJ failed to

obtain a medical expert to reconcile inconsistencies between the subsequent record and the medical source statements.

Initially, it was Simonetti's duty to supply all the adequate records and evidence to prove his claim of disability; only when the records are inconsistent should the ALJ use her discretion to order additional evidence and supplement the record. *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004). Simonetti waited until the week before the hearing to submit much of the evidence and needed time after the hearing to produce more. He also "failed to cooperate" with the Illinois Bureau of Disability Determination Services' efforts to obtain updated medical information concerning his disability claims. Simonetti never asked for a medical expert to complete the record.

"While the ALJ has a duty to develop a full and fair record, the court will determine that the ALJ failed her duty only when there is a significant omission from the record." *Kadelak v. Astrue*, 802 F. Supp. 2d 934, 943 (N.D. Ill. 2011). The ALJ can decide to secure a medical expert, but it is not mandatory. *See* 20 C.F.R. §§ 404.1518a(b), 416,919a(b). "It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation. 20 C.F.R. § 416.927(f)(2)(1) (2000). Here, the ALJ acted reasonably within her discretion in relying on the state agency and declining to obtain a medical expert. The ALJ considered opinions, examinations, and treatments from numerous sources including treating physicians and a state agency. She had a complete record to properly evaluate Simonetti's disability claim. What's more, the records before her were consistent. Accordingly, we disagree that her failure to obtain a medical expert was an abuse of discretion.

### III.    Conclusion

For the reasons set forth above, the Court finds that the Commissioner's decision denying benefits was supported by substantial evidence. The Court, therefore, denies Simonetti's motion for summary judgment [17] and grants the Commissioner's motion for summary judgment [22]. The decision of the Commissioner is affirmed.


Dated: August 11, 2014

ENTERED:

MICHAEL T. MASON
United States Magistrate Judge